Good morning, Mr. Bashman. Welcome to the Ninth Circuit. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Howard Bashman. I represent the Appellants, John M. Floyd & Associates, Inc. I'd like to reserve four minutes for rebuttal. I'll try to keep it on my end. Watch your time, okay? Counsel, could you help me on something? Yes. It looks like the crux of this is whether John Floyd & Associates gets another $120,000 or maybe $240,000 because of use after the three years of what John Floyd & Associates provided for getting the extra fees out of the ATM machine transactions and point-of-sale transactions. Is that right? I believe what Your Honor is saying is generally correct. The e-channel transactions, which you're describing, the 36-month period, did not begin to run, in our view, until that recommendation was installed. Now, why is that? It looks to me from the contract like it's a three-year deal, period. I don't doubt that you're correct, that TAPCO or that there's a genuine issue of fact as to whether TAPCO Credit Union might have used something that benefited the credit union from the services John Floyd & Associates provided during the three years. But it looks like they only get paid for three years. Let me tell you what I'm thinking of so you can clear this up in my mind. I once represented a group of physicians and they asked me to write an employment contract for a physician. It's a little bit complicated, the way group practices compensate. And I wrote it up and I charged them for it. And I haven't the slightest doubt that they kept using my form, just changing the name of the employed physician, for years afterward without paying me a nickel for it. And it never occurred to me there was anything the matter with that. Why is there anything the matter here? I didn't see anything in the contract that says once the three years ends, they can't use any of the valuable advice, services, and software installations that John Floyd & Associates put in. If I can draw a distinction between the e-channel recommendations and the recommendations that were originally installed as to checks, for example. It's our position, we agree with you that continuing to use the original recommendations after the three-year period is not addressed in the contract's express language. And so as to that, we're relying on either the theories of contract implied in fact or unjust enrichment as to those. But as to the e-channel recommendations, which were not originally installed because they could not be originally installed by the end of 2007. As to that, we rely upon page three of the contract, which is found on page 127 of the record excerpts. The paragraph, if Your Honor is turning to it, I'll wait to describe the specific paragraph. I've got it. Okay. I've got it all highlighted and everything. There's a paragraph right above qualification of earnings. Again, this is page 127, also shown as page three, which reads, fees to John Floyd & Associates will the installation of recommendations and will continue throughout the contracted engagement period. Yep, I put a star next to that. And then I looked above it and it clearly is a three-year engagement. Right. And yet the e-channel recommendations, it is the averments through the affidavits of the Floyd, both Mr. Floyd and Eric Hudgens, who's the engagements, the person in charge of the engagement, that the e-channel recommendation was not installed until the end of 2007. So what? If there had been, I think the covenant of good faith and fair dealing would be useful to you on that if there were evidence of a breach, such as if the credit union had purposely interfered with the installation in such a way that it couldn't get done until it was too late for John Floyd & Associates to make money. But there appears to be no evidence of that sort of bad faith. But may I walk Your Honor through the second portion of the contract that I believe bears on the resolution of your question? If you turn the page to 128 of the record excerpts, which is page four of the contract, the very first full paragraph at the top of that page begins, if a recommendation is not approved, it will not be included in the fee calculation. So again, as to e-channels. Yep, but the next sentence, you've got that 24 months. I'm going to turn to that momentarily. But just to stay on the first sentence, the Floyd employees say that the e-channel recommendations were approved initially, but like Your Honor understands, they could not be installed due to no fault of TAPCO until later. Can I just interrupt for just that? Because this is a problem that runs throughout the case from my perspective. Taking the framework that Judge Kleinfeld talked about, my understanding is because TAPCO used a Windows XP operating system, that none of this worked at all. Did I misunderstand something? I'm not familiar with what type of processing system they used, because I think core processors are some type of banking software. I appreciate that, but I mean, again, I don't pretend to be a tech expert, but I do know that if you have an operating system that is incompatible with an application, it won't run. And my reading of this material suggests to me that not just the initial materials, but that the e-channel material simply wouldn't work because of the XP system software. Is that mistaken? Whatever the software was, it would not work until December of 2007 as to the e-channel. So Your Honor is correct in that regard. What impact, Mr. Bashman, does that have on our analysis? You offer a product, there's a contract, it doesn't work. Is it their fault? Is it your fault? How are we to interpret what's owed, if anything, here? What our argument is is that once they were able to use our recommendation, which was to install STE channels in the way that we taught them how to do it, that once they were able to use our recommendation, that was a great step forward as to that. So if I could return back to that paragraph. Go ahead, Your Honor. I want to be sure I understand, then we'll turn you over to Judge Feinfeld again. So you're saying even though the application wouldn't run on the software that they had, that because you gave them some recommendations, kind of what I would call a workaround, that that changed everything and then the contract applied. Is that correct? Yes. The way that it works is we go to them with recommendations, they come back to us and say, yes, we say yes to the recommendations, one, two, three, four, and no to five, six, seven, eight. Yes, in the sense of, hey, that's a good idea, let's try it. But I mean, that's a whole separate – that's not what you bargained for, is it? That's not what they bargained for. Well, they don't have to pay us if it doesn't work, for sure, because then it would not be generating profits for them. I say it doesn't work because it's an XP operating system. You're saying you gave them something else or a workaround and that – you think that worked, you think they used it. Is that right? What I'm saying is that once the e-channel recommendations could be implemented in December 2007 and therefore they were earning income based on our recommendations, that's – at that point they do owe the contract to share. And the second sentence of this paragraph, if I could just turn to that, because that is key. That second sentence we submit only applies to a situation where a recommendation is not originally approved. Let me tell you what I'm understanding this to be. As I understand it, I start with at 128, I know that the recommendation was approved within the first 24 months. So that first sentence that says it won't be included in the fee calculation does not apply. Right. So I use the second sentence because it was approved within 24 months and it says it will be included in the fee calculation. Then I turn back to 127, the fee calculation, and it says they get 36 billing months. And I think that is the core of the plaintiff's argument. But then I look at the pricing option and it says three-year engagement. And I wonder why that doesn't put an end to the 36 billing months even if because of the delay that was really no fault of either party. John Floyd and Associates didn't get 36 months of their percentage out of it. As we read the contract and we think that the contract should be read, the three-year engagement and the 36 months are the same thing. And so they're not two different measurements. So I hope that that does not sidetrack the Court. It doesn't say that. I'm sorry? It doesn't say that. It seems to treat the engagement as different from the billing months because it says that basically the bank has an option and John Floyd and Associates have an option to extend it in 12-month increments. That's correct and that goes to our contingencies. That's the engagement as opposed to the billing months. Right. And what I said may not have been as well said as it should have been, which is that the length of the engagement does not necessarily have to correspond to the term of the billing months where a recommendation is installed after the other recommendations were originally installed. If I could back up. You know, if I gave you credit for everything you said, which I think Judge Smith and Judge Kleinfeld are questioning the basis for what you're saying. Well, let's say I give you credit and this is where I think the District Court went. It seems to me that you didn't file a verified complaint. Isn't that correct? I believe that is correct. It was not a verified complaint. That is absolutely correct. I looked at the complaint. I'm glad you agree with me. So with no verified complaint, then you were challenged, I guess, by your opposition to come forth with some idea that there's an allegation in the complaint that it was your belief that TAPCO had generated in excess of a million in additional non-interest income post-December 2007. And the court said there is absolutely no evidence in this record to suggest that. You were given a chance to go. Even they even afforded you ample opportunity to go in and review their computer records for information related to the use and reliance. And you didn't do it. You just relied on this one allegation in the complaint, which isn't even verified. Your Honor, I understand the question. And we would respectfully point to the fact that affidavits were filed in opposition of the summary judgment motion. But I read the affidavits, and I still don't see where it is I can find any knowledge or any information or any evidence to support what you have to say here. I came to the same point as the court. I was about to address what the information is that we believe supports those allegations. Okay, I'd like to hear it. Which is that, and in fact, this is the same evidence that the Third Circuit relied upon in the Ocean City Bank case. I'm not worried about what the Third Circuit does. I'm worried about my evidence. I want to know what evidence you've got. ICE file statements with the government which show what their non-interest income is during the periods of time concerning it. So what? None of that says it really comes from you. Right. The people at Floyd are the ones who testified that the evidence, in their view, establishes that they were relying upon. They didn't even go over and look at it. They just took these government reports and then they come up with some flim-flam affidavit saying, and some of that's attributable to me. The issue about inspecting the computers we respectfully submit is, in essence, just a sideshow because this is not a computer software program. Why didn't you go over? Why didn't you go over and get the invitation and go through the evidence? So you have some reason as an expert to say what you were going to say rather than making a flim-flam idea. Well, I've reviewed these government reports and I think, based on me knowing what I know and never having looked at the computer, I know that, but I can say this. If I could address my time with my answer. The district court is the problem. I felt like he was in the same boat I'd have been if I'd have been there. I don't know whether this is an excuse, but it's just offered as a fact, which is that the parties never reached agreements on a protective order that would have allowed Floyd to inspect the computers. Well, whether they reached that or not, they had an invitation to go. They should have gone. The invitation was subject to agreeing to a protective order that the parties were unable to enter into. If I can reserve the time. If you want to save some time, we'll give you a little bit extra because the court's been asking some questions. Let's hear from the other side. Good morning, your honors. My name is Alex Kleinberg. I'm here for TAPCO Credit Union and I believe the panel has already made. I have a couple of questions for you. If I understand your theory of how to read the contract, 36 months and it's over, is that correct? Yes, your honor. Now, I have a question about whether that's a reasonable reading. When I look at this contract, it says three year engagement. The fee is 12% of the monthly increase in non-sufficient funds and overdraft income. And the billing months are 36 months. So, I understand that to mean you get 36 months of 12% of the monthly increase in these fees. Then I look at the previous page, 126, and it says it's going to require six to eight calendar weeks for the initial engagement. If I assume that there was not the incompatibility in operating systems or whatever it was, I thought a core processor was the chip and Windows was the operating system, but the briefs were all confusing on what the delay was caused by. But if I just assume for purposes of discussion that everything was fine and everything worked out immediately because there was no incompatibility, the earliest anything would be accomplished would be one and a half to two months after the engagement began. Since it's only a three year engagement, according to 127, that means there would never be 36 billing months if the billing ends at the end of the three year engagement. So, why shouldn't we treat the plaintiff's interpretation of the contract as being the only logical interpretation? There have to be 36 months of the 12% after the improvement is installed. Yes, Your Honor, I believe that we had the 36 months under the contract. It's undisputed. There can't be, if we assume that their recommendation on the, on the electronic transactions was approved within the first 24 months. There's evidence in the record to support that. And if we use the logic that the plaintiff offered us, if a book is on the shelf before the guest visits and it's not on a shelf immediately after the guest has visited, it's a permissible inference that the guest borrowed the book. If we use that, then it's reasonable to infer that an improvement was approved within 24 months. It was installed subsequent to the 24 months, shortly before the end of the three years. And it's still either the advice or the software or both are still generating income for the bank after the three year engagement. Why don't we have to read the 36 month billing period to apply? Your Honor, I'll try to answer that question in two parts. First off, my initial response is it comes down to an evidence problem. Once again, I think the panel's made many of the points that I would make on behalf of the credit union, the district court rightly held there was not significant. I was not as impressed by that as perhaps you would wish. Frankly, one of the things that struck me was it's only a $120,000 case. You try to minimize discovery. And as long as you know there's more money that the bank is making, and you can tell it from the filings the bank has to make from the government, the trip out would be awfully expensive relative to the stakes. I hadn't thought of the difficulty that might be involved with confidentiality agreement, but obviously with bank records there would be. So I don't know that when we draw the inferences in favor of the respondent on a summary judgment motion, I don't know if you can get past that inference. Your Honor, if I may, I'd like to point out the district court recognized it was undisputed that the initial engagement under the contract ended no later than August 31st of 2004. That's consistent with the question I asked you. Why don't the 36, since there could never be 36 months of 12% on anything John Floyd and associates did, even if they did it and it worked right from the get-go, there could never be 36 months because, gosh, if they got it working one day after the engagement began, there still wouldn't be 36 months. There would be 35 months to 29 days. I'm not sure that's correct, Your Honor. August 31st of 2004, the contract terminated December 31st of 2007. That's over 36 months or over three years after the initial engagement. And all the evidence that was provided. You're saying the initial engagement was for more than 36 months or more than three years? Your Honor, the district court found that it was undisputed that the party's initial engagement ended no later than. It's summary judgment. There's no such thing as a finding of fact on summary judgment. We're not permitted to defer to the district court. I had just looked at three-year engagement on page 127 of the contract. And, Your Honor, the contract was executed in May of 2004. It terminated, our position is it terminated December 31st of 2007. That's over three years. That's about three and a half years. We submit there were 36 billing months. I should also mention, too, Your Honors, that John Floyd's own contact management software shows it knew internally the contract ended at the end of 2007. That's particularly evidenced. If it lasted three and a half years, despite it saying three-year engagement, does that mean there was a 12-month renewal? No, I'm not aware of any 12-month renewal. How could a three-year contract last three and a half unless it was renewed? Perhaps because the conduct of the parties was such that this is the way it was going to be. You mean we have to look at extrinsic evidence? No, not at all, Your Honor. We submit that an alternate basis for affirming the district court's ruling in this case is that the contract's integrated, or at least partially integrated, is to the material terms that have caused this lawsuit. We submit that all the important terms are spelled out in the written contract itself. It was the final manifestation of the court's decision. What is the evidence that it ended in December and not in May? I see the execution date in May 2004. What is the evidence that it ended in December of 2007 rather than May 2007? That, Your Honor, consists of correspondence that one of TAPCO's attorneys sent to one of John Floyd's attorneys, particularly the declaration of Mark Giske filed in support of TAPCO's motion for summary judgment. And again, I do want to emphasize that Floyd's own internal contact management software shows it knew the contract ended December 31st, 2007. You know, I'm puzzled by this ongoing dialogue that you had which, as Judge Kleinfeld points out, is outside the 36 months when, in fact, the allegation is that nothing ever worked anyway because of the operating system being Microsoft XP. What was there to talk about? I thought if it didn't work, why would there be any discussion about things being ongoing? It doesn't add up to me. Your Honor, in our view, this is a pretty simple case at its core. The only product recommendation of Floyd's we ever used is the ODP software program. That did work. That worked fine. And we paid Floyd about $147,000 over the term of the contract. Did he pay 36 months times 12% of the profits increased from that? That is my understanding, Your Honor. And the record also reflects that Floyd would regularly come out and monitor TAPCO Credit Union's computer records to ensure Floyd was getting paid pursuant to the party's contract. Is that the E? That's not the E channel. That's something else, right? That's correct, Your Honor. The only product service That's your bounced checks, right? I beg your pardon? That's your bounced checks, right? It relates to that, yes. Our overdraft protection. You pay the bank a fee, and that way, instead of bouncing the check, in effect, they lend you money. That's correct. So the bank concedes that one of the programs did work. Yes. And you got value for it. You paid for it from your perspective. So here we are on summary judgment. We have to construe the facts in the light most favorable to the non-moving party. Now, we have a bit of a problem here. It sounds like you're outside the four walls of the contract. You've got some evidentiary issues that are in conflict. How are we supposed to deal with that? Your Honor, we submit it's a very straightforward issue to resolve and dispose of. And our view, again, goes back to the- Well, it's straightforward if there's no opposition to your allegations, and or the opposition doesn't raise any material point of fact. Now, Judge Randy Smith pointed out we got a non-verified, unverified complaint. He didn't really respond. But it seems to me like we've got two different currents here. On the one hand, from an evidentiary perspective, there may be some problems, and that may be the ultimate solution. But it does seem that you are conceding that the parties didn't really strictly follow the written contract in order to understand what happened. You have to look at the extrinsic circumstances. You don't have an integrated contract. I don't know what the integration law is that applies in this particular case, but not so clear cut, is it? I respectfully disagree, Your Honor. I would not concede that. I'll say again that we did use one and only one of Floyd's products or recommendations, that being this ODP software. And we paid everything that we were supposed to pay to them as a result. We submit, again, that just because Floyd submitted two declarations in response to the credit union's motion for summary judgment, that doesn't create a genuine issue of material fact. As the panel, of course, is aware, the rules of evidence require something more than a person signing a declaration to create a genuine issue of material fact. So basically, from your perspective, they lose because the lawyers didn't produce the kind of declarations and or other writings that raise a material issue. Is that basically what you're saying? It's just totally evidentiary. We don't go outside and look at the contracts which are attached to the declaration? That is our first point, Your Honor. Yes, that's correct. We still submit that there is an alternate basis, though, for affirming. And that, of course, bears on this integration argument that we've made in our cross-appeal. Well, as I understand it, what the district court held as it relates to integration and ambiguity, the district court first held that the contract was not fully integrated. And that was because the district court was relying on the terms of the contract, which made it clear that other agreements would be reached. Then we talk about partial integration, which the district court went into. And as I understand, the district court made really two distinct determinations. One was about partial integration, but the other, maybe the alternative, was that the contract was ambiguous as to its terms. And so, therefore, regardless or not of whether there was partial integration, then at that point, that would be harmless because it was ambiguous and therefore could not be, if you will, enforced. Isn't that what the district court said? I would agree, Your Honor. Yes. So, your position is that because the contract could not be specifically enforced, what? Well, our first position is there is no genuine issue of material fact here and that the district court properly dismissed Floyd's complaint based on the fact there's no significant probative evidence in the record to support its claims. But we still submit at the end of the day, looking at the four corners of the contract, all things considered, looking at the extrinsic evidence, too, that Floyd. Well, you can't have it both ways, counsel. It's either within the four walls of the contract or you look at extrinsic evidence. Which is it? Well, Your Honors, I understand under Washington law, as seen from our principal brief on appeal, that the court is to consider extrinsic evidence in determining whether or not there's an integrated contract. And if there is an integrated contract, the extrinsic evidence is discarded. It doesn't matter. And we submit that that's what the district court should have done here. When you look at the entire record at the end of the day, our position is the contract itself is integrated even after taking John Floyd's evidence into account, and we submit that would be an alternate basis then for affirming the district court's rulings. You've already told us that the extrinsic evidence, these letters from lawyers show that they didn't follow the three-year engagement provision of the written contract. They made it three and a half. I don't believe those were my words, Your Honor, but it was, I believe the point. They weren't your words, but they're the substance of what you said. My recollection, Your Honor, is that my response regarding the attorney's letters had to do with the termination of the contract, that the contract did in fact terminate December 31st, 2007. But if the bank's lawyer says in its letter that the contract terminated in December, why isn't that an admission against interest by a speaking agent for the bank that they did not in fact follow the three-year engagement words of the contract? Your Honor, it's my understanding that there were 36 billing months and that all things considered, the parties did adhere to the contract. They did adhere to its term, its pricing. Okay. All right. Thank you for your argument. Mr. Bashman, you have a little bit of time. I'm sorry, do you have another question? Question. I'm sorry? Oh, I need to ask Mr. Bashman. Oh, yeah, no, we're going to have Mr. Bashman back. I just want to make sure. Yes, I was just going to make three quick points in rebuttal. As Judge Kleinfeld has perceptively observed, the three-year engagement period under the contract does not track the same 36-month payment period that the contract provides for, the undisputed evidence shows that. Secondly, these declarations that are being referred to by opposing counsel are sworn affidavits, they're not just mere recommendations. It's undisputed that TAPCO did install e-channel overdraft protection in December of 2007. They're not denying that. They're just saying that my client does not qualify to recover. Quick question for you, Mr. Bashman. The e-channel application, if you will, is very fuzzy to me. My impression was that Visa just gave you some ideas. Basically, here's some things you might want to try. Was it an application that you gave to them that they used? We give them our letters, instructions, how to comply with government rules and regulations that govern banks' conduct in these areas. That's a separate application than the earlier one that we talked about, right? Right. It is different from the checks. Let's treat it this way. Assume for a minute this is a separate product. You're offering this product to them. Is there anything that you can point to in the record that says that the bank said or the credit union said, yeah, we really like this product. We want to use it and this is what will pay you for it. The affidavits of both the engagement manager and John F. Floyd himself say that TAPCO accepted the e-channel recommendations initially before it was known that they could not be implemented right away. Okay. Was that a condition precedent that they assumed that it would work on their system? If these recommendations were never implemented, then we would never be entitled to any recovery. Let's assume this between us that there's a recommendation that's made and there's no way they could possibly use it. Right. That's not worth anything to them, is it? Correct. If they accept a recommendation and they cannot implement it ever, there's nothing going to be owed on that recommendation. Okay. So you're saying in this case, they accepted it, they couldn't use it, but somehow they did use it. They couldn't use it immediately, but they were able to use it before the time the original 36-month payment period had expired. Okay. And then the 36-month payment period became applicable to that recommendation beginning when they installed it. Let me see if I understand a couple things. First of all, what you give them, as I understand it, is not just software. You also give them form letters to send to the customer with his ATM card saying, here are the terms and language to use when they charge him fees for using the ATM card when he didn't actually have the cash in his account. Correct. And you give them instructions on how to get their personnel to do everything so they're complying with government regs. Correct. Now, there's a statement on page 91 of the excerpts in Floyd's affidavit, and what Floyd says is the expanded overdraft privilege program TAPCO offered to its customers for electronic transactions, and I gather that's the only ones that are really at issue today, the electronic ones, right? Well, as Your Honors understood, and this was, as I heard, you were hypothetical about your form contract. You know, the other aspect of our breach of contract is that they continue to use the original recommendations after the original 36-year period was over. And as Professor Smith understands. I see. So it's both. It's both. Right. It's the non-sufficient fund checks and also the ATM cards. Yes. Okay, finishing that sentence. It says, thereafter, the expanded overdraft privilege programs TAPCO offered to its customers for electronic transactions, ATM, and POS. What is that, using your bank card at a store? Correct. Okay. Transactions was modeled after and based upon Floyd's proprietary recommendations, products, or services. The affidavit has to be based on personal knowledge and not mere speculation to satisfy Rule 56. How would John Floyd know that they're still using materials modeled after and based upon Floyd's proprietary recommendations, products, and services during that time period? The, what I can offer in response to that is that we gave them the presentations. And, you know, all of a sudden, when they were capable of having an e-channel overdraft program, they implemented one without having contracted with another entity that provided. How do you know they didn't contract with somebody else who did it? We know as a result of the fact that they're arguing in their documents that they did it themselves. That's their argument in this case, is that they just implemented one of their own making. And, it'd really be good if you went in there and looked, so you could say for sure, wouldn't it? The, I mean, that's the bottom line of where the district court went. I mean, the district court, the district court, you know, it's just a minute, but just a minute. District court said it'd been really good if you'd have gone over there and you'd have looked when you had the chance. So, you wouldn't have to have these affidavits. The district court rejected, in effect, because of the same reason I had rejected. I mean, you haven't got any foundation for what you got to say. The, the Floyd's company with all the. It would have been really good if you'd have gone over there. Then, you'd have something to tell Judge Kleinfeld, right? If, if we'd gone over there, certainly we wouldn't be having this conversation. That would have been really good. But, but on the other hand, this is a company that makes money when banks make money. And, and what, what my client needs to do to achieve. And regardless of it being $120,000 or whatever it was, it would have been good for you to go over so you could have put something really in those affidavits rather than a good guess. Well, I think, Your Honor, and I understand that the Third Circuit rulings are not binding on this court, but the Third Circuit did find in the case involving my client that my client's testimony based on bank financial statements was sufficient to demonstrate at the summary judgment stage that a bank that was denying it and used my client's recommendations had, in fact, used those recommendations. I was, I was thinking, if you went over to look, what would you see? And I was having trouble thinking of what you'd see by walking over to the bank and looking. But then I thought, gee, I know what I'd be inclined to do. I'd open a bank account and get an ATM card and get their form letter and their little pamphlet that nobody reads and all that and look at it and say, aha, that's our words. That's what we gave them. Yes, I wish we'd been that clever, but unfortunately, we were not. We appreciate, both of you, appreciate your argument. Thank you, Your Honor. Appreciate your coming out, and the case just argued is submitted.
judges: Kleinfeld, Smith, Smith